FILED
United States Court of Appeals
Tenth Circuit

May 29, 2015

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

TENCH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

KYLE LUNNIN,

Defendant - Appellant.

No. 14-3113
(D.C. No. 5:13-CR-40039-JAR-7)
(D. Kan.)

ORDER AND JUDGMENT[*]

Before **BRISCOE,** Chief Judge, **MURPHY** and **GORSUCH**, Circuit Judges.

Defendant Kyle Lunnin was convicted by a jury of conspiracy to distribute and

possess with intent to distribute methamphetamine and marijuana, in violation of 21

U.S.C. §§ 846 and 841(a)(1), and witness tampering, in violation of 18 U.S.C. §

1512(a)(2)(A). Lunnin was sentenced to a term of imprisonment of 168 months. Lunnin

now appeals, arguing that (a) the government's evidence was insufficient to support either

conviction, (b) the district court erred in admitting coconspirator statements, (c) the

prosecution violated his right to due process by relying on false testimony from a key

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

witness, (d) his sentence is procedurally unreasonable in three respects, and (e) the length of his sentence is substantively unreasonable. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm Lunnin's convictions and sentence.

I

*The drug conspiracy*

In early 2012, Carlos Espinoza and Blaine Smith, both longtime residents of Salina, Kansas, pooled their money to obtain marijuana from sources in Colorado for resale in Salina and Iowa, where Blaine Smith was attending college. At the beginning of this arrangement, Blaine Smith either traveled alone to Colorado to obtain the marijuana, or Espinoza paid other people to do so. These trips occurred every few weeks and approximately two to three pounds of marijuana were purchased on each trip and later resold.

As the year progressed, the scope of the scheme expanded. To begin with, Blaine Smith's father, Shawn Smith, became involved in this scheme and began making the trips to Colorado to purchase marijuana. Further, after Shawn Smith became involved, the quantities purchased and resold by the group increased and they also began purchasing and reselling methamphetamine. In addition, other individuals from the Salina area began contributing money for the purchase of drugs. The group also distributed drugs to a number of other individuals in the Salina area for resale.

Shawn Smith was arrested in Salina on December 3, 2012, after returning from Colorado to purchase drugs. Espinoza was arrested in February 2013. Law enforcement

2

officials estimated that, from the beginning of the scheme until the time of Espinoza's arrest, the group purchased and resold approximately 50 pounds of methamphetamine and between 150 and 200 pounds of marijuana.

Subsequent investigation, including monitoring of Shawn Smith's phone calls and visits while in jail, examination of written records maintained by Shawn Smith while in jail, and examination of Shawn Smith's and Espinoza's iPhone and iPad data, led law enforcement officials to others involved in the organization, including defendant Kyle Lunnin.

*Lunnin's indictment, arrest and release*

On May 1, 2013, a federal grand jury returned a single-count indictment charging Shawn Smith, Espinoza, David Clovis, Blaine Smith, Alex Garay, Dustin Lunnin (the defendant's brother), and Kyle Lunnin with conspiracy to possess with the intent to distribute, and to distribute, in excess of 500 grams of a mixture and substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 846 and 841(a)(1).

Lunnin was arrested on May 9, 2013, but released on bond later that same day.

*Lunnin's threats to witness*

On August 29, 2013, Lunnin was at the Salina office for the Kansas Department for Children and Families (DCF). As Lunnin was walking through the lobby area on his way out of the building, he observed a man named Ray Hinderliter sitting in the lobby with his wife. Hinderliter, a Salina resident who had been involved in the drug conspiracy, had agreed to cooperate with law enforcement officials and assist them in

3

their investigation of the conspiracy. Prior to their encounter, Hinderliter's name had been disclosed to defense counsel as a possible government witness. Lunnin, obviously aware of Hinderliter's assistance to law enforcement officials, paused briefly in front of Hinderliter, looked straight at him, told him "that he knew what was up," ROA, Vol. 3, Part 1 at 270, and said: "You fucking pussy, you're the feds and you're going to die," id., Part 2 at 415. Lunnin also said to Hinderliter, "I'll kill you," and then he kept saying "watch, watch, watch" as he walked out the front door of the office. Id.

*The superseding indictment*

On October 23, 2013, a federal grand jury returned a first superseding indictment that charged Lunnin with the same conspiracy charge that was alleged in the original indictment, but that also included a second count charging Lunnin with witness tampering, in violation of 18 U.S.C. § 1512(a)(2)(A). More specifically, this new charge alleged that on August 29, 2013, Lunnin "knowingly, willfully, and unlawfully use[d] the threat of physical force, including the threat of death, against prospective witness Ray Hinderliter, with the intention to influence, delay, or prevent the testimony of Ray Hinderliter in an official proceeding, that being the trial of . . . Lunnin on the conspiracy charge." Id., Vol. 1 at 14.

*Lunnin's trial and sentencing*

The case against Lunnin proceeded to trial on January 7, 2014. The government presented testimony from various witnesses, including four of Lunnin's alleged coconspirators (Blaine Smith, Alex Garay, David Clovis, and Ray Hinderliter). At the

4

conclusion of the government's evidence, the jury found Lunnin guilty of the two counts alleged in the first superseding indictment.

On May 27, 2014, the district court sentenced Lunnin to a term of imprisonment of 144 months on the conspiracy conviction and 24 months on the witness tampering conviction, with the two terms to be served consecutively to each other, resulting in a total term of imprisonment of 168 months. The district court also ordered Lunnin to serve a 60-month term of supervised release.

II

*A. Sufficiency of evidence - conspiracy conviction*

In his first issue on appeal, Lunnin challenges the sufficiency of the evidence supporting his conspiracy conviction. We review de novo a challenge to the sufficiency of the evidence supporting a criminal conviction, "but in doing so we owe considerable deference to the jury's verdict." United States v. King, 632 F.3d 646, 650 (10th Cir. 2011) (internal quotation marks omitted). We ask "only whether taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." Id. (internal quotation marks omitted). "We will not weigh conflicting evidence or consider witness credibility, as that duty is delegated exclusively to the jury." Id. (internal quotation marks omitted). Instead, we will "reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. (internal quotation marks omitted).

"To obtain a conspiracy conviction, the government must prove: (1) an agreement by two or more persons to violate the law; (2) knowledge of the objectives of the conspiracy; (3) knowing and voluntary involvement in the conspiracy; and (4) interdependence among co-conspirators." United States v. Cornelius, 696 F.3d 1307, 1317 (10th Cir. 2012) (internal quotation marks omitted). Lunnin contends that the government failed to prove each of these elements at trial.

*1) An agreement to violate the law*

Lunnin asserts that "no witness testified about an agreement between [him] and any co-Defendant." Aplt. Br. at 27. Lunnin also notes that several of the alleged coconspirators expressly admitted at trial that they "had no personal knowledge of any drug activity by [Lunnin]." Id. And "[p]erhaps most telling," Lunnin asserts, is that "the sea of damning electronic data in Espinoza's iPad revealed [Lunnin]'s name only mentioned concerning [a] $5000 loan." Id. Ultimately, Lunnin asserts that he "never agreed to possess [drugs] with intent to distribute." Id. at 29. Instead, he suggests, "the loan" he made to Shawn Smith "was like a drug buy for personal use." Id. at 28. "It was," he asserts, "a one-time investment, made on the cusp of Shawn's arrest, that went nowhere." Id.

Notably, Lunnin does not dispute that the government's evidence overwhelmingly established that Shawn Smith, Espinoza, Blaine Smith, and several other individuals in the Salina area agreed to sell marijuana and methamphetamine for a profit. More specifically, these individuals agreed that on a regular basis they would pool their money,

6

travel to Colorado and use the pooled money to purchase large quantities of marijuana and methamphetamine, return to Salina with the drugs and divide them up for distribution to lower-level dealers and end-users, and profit from the sale proceeds.

The question is whether the government's evidence in this case allowed the jury to find beyond a reasonable doubt that Lunnin joined in this agreement. Contrary to Lunnin's arguments, we conclude that the government's evidence was sufficient on this point. To begin with, Ray Hinderliter, the government's cooperating witness, testified that he became involved in the conspiracy at some point between August and October 2012 when he began purchasing methamphetamine from Shawn Smith. According to Hinderliter, that involvement continued, despite Shawn Smith's arrest in December 2012, until January 2013 when the police raided his house. During that time period of his involvement, Hinderliter testified, he first met defendant Lunnin when Lunnin came to his house for tattoo work (Hinderliter was a tattoo artist). During that first visit, Hinderliter testified, Lunnin paid for the tattoo work with a small amount of methamphetamine and also personally used methamphetamine in Lunnin's garage. A few days later, Hinderliter testified, Lunnin returned to Hinderliter's house and picked up drug money from Hinderliter on behalf of Shawn Smith.

Brent Rupert, a Salina police officer who was the case agent, testified and provided additional details regarding Lunnin's involvement with the conspiracy. Rupert testified that Shawn Smith, following his arrest, called Espinoza on December 15, 2012, from jail and directed him "to get ahold of [Lunnin] to get things going, to get things set

7

back up with" their methamphetamine supplier in Colorado. ROA, Vol. 3, Part 2 at 500. Rupert further testified that on January 2, 2013, Lunnin visited Shawn Smith in jail and that jail personnel recorded their conversation. According to Rupert, this conversation indicated that "Lunnin invested $5,000 with Shawn Smith" and his drug operation "for a return of [$]7,500" and that Shawn Smith reassured Lunnin that he would be receiving his anticipated return soon. Id. at 513. Just hours after Lunnin's visit, Rupert testified, Shawn Smith and Lunnin spoke to each other by telephone and that Shawn Smith again referred to Lunnin having invested $5,000 with an expected return of $7,500.

The following day, January 3, 2013, Shawn Smith spoke by telephone with Lunnin's brother, Dustin Lunnin, and directed Dustin "[t]o sit down" with Lunnin and Nicole Lehman, who was Shawn Smith's girlfriend, "and have a meeting to discuss going back to Colorado and make some more trips." Id. at 515. On January 20, 2013, Shawn Smith spoke by telephone with Lehman, his girlfriend, and directed her to contact Dustin Lunnin and see if he and defendant Lunnin wanted to participate in a drug run to Colorado. Finally, Rupert testified that on February 11, 2013, Shawn Smith was transferred from the Saline County Jail in Salina to federal custody. During that transfer, Rupert testified, he found in Shawn Smith's personal papers "the back of a cardboard section off of a notebook pad that Shawn Smith" had been using to make notations regarding his drug operation. Id. at 534. Among the notations, Rupert testified, was the following: "Rich San Fran, Kyle Red 4 pounds." Id. at 540. According to Rupert, he interpreted this notation to mean "that 'Rich was from San Francisco; that he supplies

8

marijuana; and that Kyle [Lunnin] and Red [Dustin Lunnin] also supplied some marijuana" to Shawn Smith. Id.

We conclude that this evidence, considered as a whole, was sufficient to allow the jury to reasonably infer that Lunnin joined in the conspirators' agreement at some point in the latter part of 2012, first by assisting Shawn Smith in collecting money for drugs that were dispersed to lower-level dealers, and then, in November or December 2012, investing $5,000 in the scheme in the hopes of making a profit of $2,500. See United States v. Wardell, 591 F.3d 1279, 1287 (10th Cir. 2009) (holding that "an agreement may be inferred entirely from circumstantial evidence").

*2) Knowledge of the objectives of the conspiracy*

Lunnin next argues that the government failed to establish "by clear and unequivocal evidence that [he] knew the object of the conspiracy was the distribution of drugs, and his agreement to cooperate in achieving that objective." Aplt. Br. at 30. We disagree and conclude that the jury in Lunnin's case could reasonably have inferred that Lunnin was well aware of the objectives of the conspiracy. Indeed, the evidence indicates that Lunnin personally used methamphetamine, used methamphetamine to purchase services, picked up drug money on behalf of Shawn Smith, assisted Smith and others in counting drug money, and ultimately invested $5,000 in the conspiracy in hopes of making a profit of $2,500 from the sale of drugs. Although Lunnin argues that "the specific purpose of the [$5,000] loan was never proven beyond a reasonable doubt," Aplt. Br. at 31, we conclude that the jury could reasonably have inferred that Lunnin intended

9

for the money to be used for the purchase of drugs with the anticipation that the resulting resale of those drugs would result in a profit to him.

*3) Knowing and voluntary involvement in the conspiracy*

Lunnin argues that the government failed to establish his knowing and voluntary involvement in the conspiracy "because specific intent was never demonstrated." Aplt. Br. at 31. In support, Lunnin argues that his "involvement was limited to a single loan, and there was no evidence that he . . . knowingly participated in drug distribution, nor knew what Shawn [Smith] would use the money for." Id. at 32-33. In other words, Lunnin argues, there is no evidence that he intended to possess marijuana or methamphetamine with the intent to distribute.

Again, however, we disagree. As noted, the government's evidence established that Lunnin personally consumed methamphetamine and also used it to pay for services. In addition, it was established that Lunnin picked up drug money from Ray Hinderliter on behalf of Shawn Smith. Further, in November or December 2012, Lunnin gave $5,000 to Shawn Smith and the evidence indicates that Lunnin expected to make a profit of $2,500 on this "investment." In early January 2013, Lunnin visited Shawn Smith in jail and the two discussed this money and whether Lunnin would receive his anticipated profit. The jury could reasonably have inferred, taking into account all of this evidence, that Lunnin knew, at the time he gave the $5,000 to Shawn Smith, that Shawn Smith would use the money to purchase drugs in Colorado for resale in Salina. The jury could also have reasonably inferred that Lunnin knew the "loan" was intended for illicit purposes due to

10

the unusually high rate of return he expected to receive. Thus, in sum, the jury could reasonably have found that Lunnin intended for his coconspirators to possess and distribute methamphetamine and/or marijuana for a profit.

*4) Interdependence among coconspirators*

Finally, Lunnin argues that the government failed to establish the element of interdependence. More specifically, Lunnin argues that the "one-time loan . . . was between [himself] and Shawn [Smith]" and "never impact[ed] the other conspirators, especially since there was no evidence the money was used." Aplt. Br. at 35. In short, he argues, "[t]his was an isolated transaction not demonstrably linked to the conspiracy." Id.

We conclude, however, that the jury could reasonably have determined that Lunnin's "loan" to Shawn Smith impacted the other conspirators by providing the group with funds with which to purchase drugs for resale. In other words, the jury could reasonably have found that Lunnin's "loan" constituted an essential step toward the realization of the conspirators' common, illicit goal, i.e., the distribution of drugs in Salina in order to make a profit. As for Lunnin's contention that "there was no evidence the money was used," the jury could have reasonably inferred, based upon the discussion between Lunnin and Shawn Smith at the jail in early January 2013 that Shawn Smith had, in fact, used the money to purchase drugs.

*B. Admission of coconspirator hearsay statements*

Prior to trial, Lunnin moved to exclude the statements of his alleged

11

coconspirators. The district court responded by conducting a <u>James</u> hearing,[1] during which the government presented testimony from four cooperating witnesses: David Clovis, Ray Hinderliter, Blaine Smith, and Alex Garay. The government also provided the district court with digital recordings of the phone calls and in-person visits that occurred between Shawn Smith and other coconspirators while Smith was in jail. The district court ultimately ruled that, with respect to the four cooperating witnesses, all of the statements made to them by alleged coconspirators were admissible pursuant to Fed. R. Evid. 801(d)(2)(E). Likewise, the district court ruled that the recorded jail calls and visits were admissible pursuant to Fed. R. Evid. 801(d)(2)(E).

On appeal, Lunnin argues that the district court erred in admitting this evidence. We review for abuse of discretion a district court's decision to admit evidence pursuant to Fed. R. Evid. 801(d)(2)(E). <u>United States v. Hall</u>, 473 F.3d 1295, 1303 (10th Cir. 2007). In doing so, "we will not disturb an evidentiary ruling absent a distinct showing that it was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error in judgment." <u>Id.</u> (internal quotation marks omitted).

"Although hearsay statements are generally not admissible at trial, <u>see</u> Fed. R. Evid. 802, 'a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy' is not hearsay, and is therefore admissible as substantive evidence

---

[1] <u>See</u> <u>United States v. James</u>, 590 F.2d 575, 582 (5th Cir. 1979) (establishing the rule that a trial court should not allow the jury to hear out-of-court coconspirator declarations without first holding a hearing, outside the jury's presence, to determine whether such statements are admissible under Fed. R. Evid. 801(d)(2)(E)).

against the party, Fed. R. Evid. 801(d)(2)(E)." Id. at 1302. "For a statement to be admissible under Fed. R. Evid. 801(d)(2)(E), the District Court must first find the following elements by a preponderance of the evidence: (1) that a conspiracy existed; (2) that the declarant and the defendant were both members of the conspiracy; and (3) that the statements were made in the course of and in furtherance of the conspiracy." Id. at 1302-03 (internal quotation marks omitted).

Lunnin asserts, incorporating by reference the specific arguments outlined in his first issue on appeal, that "there was insufficient evidence demonstrating [he] was a member of the conspiracy because there was no evidence he knew of the conspiracy or joined in its objective." Aplt. Br. at 40. We reject this assertion for the reasons previously stated. In sum, the government's evidence was sufficient to allow the jury to reasonably find that Lunnin knew about the conspiracy and its objectives and knowingly and voluntarily decided to join in it.

Lunnin also argues that, "[e]ven assuming such a conspiracy existed and [he] was a member [of it]," the statements of his co-defendants should not have been admitted because "there is no evidence the statements . . . furthered the conspiracy[] or promoted the conspiratorial objectives." Id. Lunnin does not, however, point to any specific statements that he believes were improperly admitted at trial. Instead, Lunnin simply cites to general categories of testimony given by the four alleged coconspirators at the James hearing. As the government correctly notes, Lunnin has thus failed to comply with Fed. R. App. P. 28(a)(8)(A) which states that the appellant's brief must contain, among

other things, the "appellant's contentions and the reasons for them, with citations to the authorities and <u>parts of the record on which the appellant relies</u>." (emphasis added). Lunnin's failure in this regard makes it impossible for us to determine precisely what testimony Lunnin is now objecting to.

In any event, having examined the record on appeal, we conclude that all of the evidence presented by the government at trial was relevant to show (a) how the conspiracy originated, (b) how it functioned, (c) that it continued even after Shawn Smith's arrest in early December 2012, or (d) Lunnin's specific involvement in the conspiracy. Thus, we conclude the district court did not abuse its discretion in admitting this testimony or the recordings of Shawn Smith's conversations while in jail.

### C. Prosecution's reliance on Hinderliter's testimony

In his third issue on appeal, Lunnin argues that the prosecution violated his right to due process by knowingly relying on what he claims was false testimony from witness and alleged coconspirator Ray Hinderliter.

### 1) Facts relevant to the claim

Hinderliter, by his own admission, was a member of the conspiracy and purchased approximately five pounds of methamphetamine from Shawn Smith during the course of the conspiracy. On direct examination, Hinderliter described an incident when Shawn Smith was at his house receiving a tattoo:

> There was people coming and going, and in fact I believe it's the same day I met [coconspirator] David Clovis. There was three or four people that had came, brought money to Shawn [Smith] while he was there being

14

tattooed.  And then as the day went on and it got towards the end of the day, you know, Shawn had a large amount of money that was in a big Tupperware container.

And Red [Dustin Lunnin] showed up, Kyle [Lunnin] showed up, and Shawn [Smith] was already there, and they're the ones that actually sat on the floor in my tattoo room there and they started counting money.  You know, it was a large amount.  A lot if it had rubber bands and stuff around it.  They started counting money.

And it wasn't very long before Shawn [Smith] said, well, let's just start weighing it.  So there was some way they was dividing different denominations of bills into piles and one guy would kind of stack them up and give them to the other guy that was weighing them, and then they would write them down and put them back into the Tupperware container.

ROA, Vol. 3, Part 2 at 406-07.

On cross-examination, Hinderliter admitted that he had been interviewed twice by case agent Brent Rupert, once in January 2013 and a second time in December 2013. Defense counsel asked Hinderliter if he had told Rupert about the incident involving Kyle Lunnin and others counting a large quantity of money at his home.  Hinderliter testified that he "believe[d]" that he told Rupert during both interviews about Kyle Lunnin's involvement in the incident.  Id. at 440.

When Rupert later testified on behalf of the government, defense counsel asked him if he "remember[ed] [Hinderliter's] testimony" that "he had told you and other investigators . . . about this incident that he related where Kyle Lunnin was with some other people counting large amounts of money at his house."  Id. at 549.  Rupert responded "Yes."  Id.  Under further questioning by defense counsel, Rupert proceeded to testify, consistent with a post-interview report he wrote, that Hinderliter informed him

15

about the money-counting incident, but did not mention that Kyle Lunnin was present.

Id. at 549-51. The cross-examination by defense counsel concluded with this question and answer:

> Q. And so when [Hinderliter] told us yesterday that he had told you in December [2013] that Kyle Lunnin was there counting money, that was incorrect, wasn't it?
>
> A. That was not – yeah, that was incorrect. That's not correct.

Id. at 551-52.

Notably, the district court later addressed this conflicting testimony in its oral ruling denying Lunnin's motion for judgment of acquittal:

> If the jury chooses to believe, and I think they could believe, that Mr. Hinderliter did in fact see the Lunnin brothers sitting on the floor with Shawn Smith counting money, even though Ray Hinderliter apparently didn't say that to the officer [Rupert], that doesn't necessarily meant it didn't happen. Probably a lot of things he didn't tell the officer. I think a reasonable jury could establish that whether because of lack of memory or otherwise, but the mere fact that [Hinderliter] didn't report every single detail and every single thing on every particular person does not mean if he testifies about something it's necessarily not true. A jury could, obviously, find that it's not true, but they could also believe him. I think a reasonable jury could do that since much of his testimony was corroborated by others as well.

Id. at 578.

*2) Standard of review*

Because Lunnin did not raise this issue in the district court, we review it only for plain error. United States v. Dunn, 777 F.3d 1171, 1176 (10th Cir. 2015). "To succeed under plain error review, the defendant must show (1) an error, (2) that is plain, (3) which

16

affects substantial rights, and (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id.

### 3) Analysis

We conclude that there was no error in this case, let alone an error that was plain, for the simple reason that Lunnin cannot establish that Hinderliter's testimony was false or that the prosecution knew it was false. Indeed, as outlined above, the district court in this case, having listened to all of the testimony, rejected Lunnin's argument that Hinderliter "decided to change his story once he got to court and accuse Kyle Lunnin of things that he apparently did not do, like show up at his house and count money." ROA, Vol. 3, Part 2 at 569. In the district court's view, the jury could reasonably have found that Hinderliter simply failed to report every detail to Rupert and that Hinderliter did, in fact, observe Lunnin counting large amounts of money at his home. Notably, nothing in the record on appeal undermines the district court's conclusion on this point.

### D. Sufficiency of evidence - witness tampering conviction

In his fourth issue on appeal, Lunnin argues that the evidence presented at trial was insufficient to support his conviction for witness tampering. As previously noted, we review de novo a challenge to the sufficiency of the evidence supporting a criminal conviction, "but in doing so . . . owe considerable deference to the jury's verdict." King, 632 F.3d at 650 (internal quotation marks omitted). Under that standard, we will "reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. (internal quotation marks omitted).

17

Lunnin's witness tampering conviction arose under 18 U.S.C. § 1512(a)(2)(A).

That statute provides as follows:

> Whoever uses physical force or the threat of physical force against the person, or attempts to do so, with intent to—
> (A) influence, delay, or prevent the testimony of any person in an official proceeding
> * * *
> shall be punished as provided in paragraph (3).

18 U.S.C. § 1512(a)(2)(A).

Lunnin concedes that "[t]he language [he] used" towards Hinderliter "could be interpreted as a threat," but he argues that "the tone, demeanor, and context prove otherwise." Aplt. Br. at 48. In support, Lunnin asserts that "[t]he exchange between [himself] and Hinderliter at the welfare office was brief, lasting five seconds at most." Id. He further asserts that he "did not speak loudly or angrily," "raise his voice[,] or make any threatening gestures." Id. In addition, he asserts that Hinderliter "did not immediately show any concern or fear" and instead "looked confused and embarrassed." Id.

We reject Lunnin's arguments. We have interpreted a "threat" as a statement "that a reasonable person in the circumstances would understand as a declaration of intention, purpose, design, goal, or determination to inflict bodily injury on another." United States v. Heineman, 767 F.3d 970, 972 (10th Cir. 2014) (considering prosecution under 18 U.S.C. § 875(c)) (internal quotation marks and brackets omitted). In this case, it is undisputed that on August 29, 2013, Lunnin encountered Hinderliter in the lobby of the

18

Salina DCF office, paused in front of him and, while looking straight at him, told him "that he knew what was up," ROA, Vol. 3, Part 1 at 270, and said: "You fucking pussy, you're the feds and you're going to die," id., Part 2 at 415. Lunnin also said to Hinderliter, "I'll kill you," and then he kept saying "watch, watch, watch" as he walked out the front door of the office. Id. Quite clearly, this could have been understood by Hinderliter as a "declaration of [Lunnin's] intention, purpose, design, goal, or determination to inflict bodily injury on" Hinderliter. And, indeed, the evidence presented at trial indicated that Hinderliter, as well as an unrelated woman in the lobby who overheard Lunnin, understood Lunnin's words in this manner because they each called 911 for help. Although it is true that the encounter was brief and Lunnin did not raise his voice or make any threatening gestures, the fact remains that the words used by Lunnin, particularly when considered in light of the fact that Hinderliter had already been disclosed to the defense as a possible government witness, could have been interpreted as a threat.

Lunnin also argues that, "[e]ven if a jury could find a true threat, it could not reasonably conclude [that he] intended to affect Hinderliter's testimony." Aplt. Br. at 49. In support, Lunnin asserts "[t]here was no evidence that Hinderliter or [he] knew on August 29, 2013 that Hinderliter would be a witness in this case" and "thus [he] had no reason to believe that Hinderliter would testify." Id. He further asserts that he "did not condition his statement [to Hinderliter] on Hinderliter's behavior" and, in fact, he "knew he had no hope of influencing Hinderliter's behavior." Id. at 49-50. In short, Lunnin

19

asserts, "[t]his was an utterance made in aggravation, not aggression." Id. at 50.

While it is true that a jury could have determined that Lunnin's statements to Hinderliter were an expression of aggravation, it is equally true that the jury could reasonably have found that Lunnin intended to scare Hinderliter and thereby influence his behavior. To begin with, the jury could reasonably have found that Lunnin knew, based upon his having called Hinderliter a "fed," that Hinderliter had cooperated with and provided relevant information to law enforcement regarding the conspiracy. It is also undisputed that the incident occurred well after Lunnin had been indicted in this case. Finally, given the severe nature of the threat conveyed by Lunnin to Hinderliter, the jury could reasonably have concluded that Lunnin intended for his threat to alter Hinderliter's cooperation with the prosecution.

For these reasons, we conclude that the evidence presented at trial was sufficient to support Lunnin's conviction for witness tampering.

### E. Cumulative error

In his fifth issue on appeal, Lunnin argues that "[t]he confluence of errors" alleged in Issues One through Four "constitute a trial plagued by speculation and prejudice and demonstrate [he] was denied his constitutional right to a fair trial." Aplt. Br. at 53. In analyzing a claim of cumulative error, such as this, "we aggregate all the errors that we have found to be harmless and determine whether their cumulative effect on the outcome of the trial mandates reversal." United States v. Banks, 761 F.3d 1163, 1201 (10th Cir. 2014) (internal quotation marks omitted). "Stated otherwise, we ask whether a defendant

20

has demonstrated that multiple non-reversible errors infected his trial." Id. at 1202 (internal quotation marks omitted).

In this case, Lunnin has failed to identify any errors, harmless or otherwise. As a result, "the cumulative-error doctrine [is] unavailable to [him]." Id.

### F. Procedural reasonableness of the sentence

In his sixth issue on appeal, Lunnin contends that his sentence was procedurally unreasonable in three separate respects: (a) the district court erred in imposing a two-level enhancement for obstruction of justice; (b) the district court erred in failing to afford him a four-level reduction for having played a minimal role in the conspiracy; and (c) the drug amounts attributed to him were incorrect.

"We review a sentence for reasonableness under an abuse-of-discretion standard." United States v. Lente, 759 F.3d 1149, 1155 (10th Cir. 2014) (internal quotation marks omitted). "Procedural reasonableness involves using the proper method to calculate the sentence." Id. "Procedural error includes," among other things, "failing to calculate (or improperly calculating) the Guidelines range." United States v. Sanchez-Leon, 764 F.3d 1248, 1261 (10th Cir. 2014) (internal quotation marks omitted).

### 1) Obstruction-of-justice enhancement

In calculating Lunnin's total offense level, the district court imposed a two-level enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1 based on Lunnin having threatened Hinderliter at the Salina DCF office on August 29, 2013. Lunnin now argues on appeal that this enhancement was improper because "[t]he only obstructive act

the prosecution alleged was witness tampering" and "the evidence does not support the tampering charge." Aplt. Br. at 55.

Having already concluded that the evidence presented at trial was in fact sufficient to support Lunnin's witness tampering conviction, we summarily reject Lunnin's challenge to the two-level enhancement for obstruction of justice.

*2) Reduction for minimal role*

Lunnin argued below that he was entitled to a four-level reduction in his offense level pursuant to U.S.S.G. § 3B1.2 for having played a minimal role in the conspiracy. In support, Lunnin argued that all he did "was lend $5,000.00 to Shawn Smith," and that "[h]e never went on any drug trips, or ever sold drugs himself." ROA, Vol. 2 at 26.

At sentencing, the district court found that Lunnin in fact loaned more than $5,000 to Shawn Smith:

> [T]here was evidence at trial that Kyle Lunnin's involvement in the conspiracy included lending money to Shawn Smith for purposes of drug-buying trips. And Mr. Lunnin objects that it was only $5,000 and he lost that investment.
>
> Mr. Smith, in proffers before trial, stated that it was $22,500, and during trial that amount of money was testified to as well. There are others that didn't say the amount of money but said that they had seen Mr. Kyle Lunnin delivering, as they put it, large sums of money to Mr. Shawn Smith. So based on that, the Court finds that there is sufficient evidence to overrule and deny the objection . . . and sufficient evidence that there was in fact $22,500, as Mr. Shawn Smith, said, or substantially more than the $5,000 that Kyle Lunnin indicates.

ROA, Vol. III at 631-632.

The district court in turn denied Lunnin's request for a four-level reduction for

22

having played a minimal role in the offense:

> Objection number 2 has to do with the role in the offense. And the Court will overrule and deny that objection because Mr. Kyle Lunnin is not being assessed with the entire amounts that were reasonably foreseeable to him as a coconspirator in this case but is only being assessed conduct that can be attributed directly to him. He doesn't qualify for a role of reduction under the guidelines. The role reduction is something that applies when a defendant is assessed with more than what they were involved with in the conspiracy. The guidelines call for them to then receive a role reduction when their role in the conspiracy was less than that of the average other conspirator.

Id. at 632-33.

We agree with Lunnin that the district court erred in making this latter ruling. As Lunnin correctly notes in his appellate brief, the Commentary to § 3B1.2, specifically Application Note 3(A), states:

> A defendant who is accountable under § 1B1.3 (Relevant Conduct) only for the conduct in which the defendant personally was involved and who performs a limited function in concerted criminal activity is not precluded from consideration for an adjustment under this guideline. For example, a defendant who is convicted of a drug trafficking offense, whose role in that offense was limited to transporting or storing drugs and who is accountable under § 1B1.3 only for the quantity of drugs the defendant personally transported or stored is not precluded from consideration for an adjustment under this guideline.

U.S.S.G. § 3B1.2, cmt. n.3(A). This language makes clear that, contrary to the conclusion reached by the district court, a defendant such as Lunnin, who was held accountable only for the quantity of drugs that he was personally involved with, is not precluded from receiving an adjustment under § 3B1.2.[2]

_____

[2] Although the government argues that "[t]he district court's statement . . . could be
(continued...)

23

Where, as here, the district court makes a procedural error in calculating a defendant's advisory Guidelines range, "[t]he Government has the burden of establishing by a preponderance of the evidence that the district court's procedural miscue[] w[as] harmless." United States v. Kieffer, 681 F.3d 1143, 1169 (10th Cir. 2012). The government in this case responds by arguing that Lunnin "invested money with Smith's organization for the purchase of methamphetamine from Colorado, collected money on at least one occasion from Hinderliter, counted a large sum of drug money for Smith, and that when Smith was in jail, he tasked two of his associates with contacting the defendant to make more trips to Colorado." Aplee. Br. at 60.

We agree with the government that the district court's error was harmless. Under the law of this circuit, it was Lunnin's burden at sentencing to prove, by a preponderance of the evidence, that he was a minimal participant in the conspiracy. United States v. Bowen, 437 F.3d 1009, 1020 (10th Cir. 2006). The only effort that Lunnin made to satisfy this burden, however, was by arguing that he loaned only $5,000 to Shawn Smith for the purchase of drugs. As noted, the district court rejected this argument and expressly found, based upon statements made by Shawn Smith to law enforcement, that Lunnin actually loaned $22,500 to Smith with the anticipation of making $10,000 in profits. Thus, even though the district court committed a legal error by misconstruing its authority to impose a reduction under § 3B1.2, it otherwise effectively rejected the key

---

[2](...continued)
interpreted as a finding that the defendant did not deserve a mitigating role adjustment based on the facts of the case," we disagree. Aplee. Br. at 60 n.19.

24

fact-based argument made by Lunnin in support of the minimal-participant reduction. Moreover, given Lunnin's financial contributions to Shawn Smith, we conclude that he was not "substantially less culpable than the average participant." U.S.S.G. § 3B1.2, cmt. n.3(A). Relatedly, it is reasonable to infer from Lunnin's investment that he understood "the scope and structure of the enterprise and . . . the activities of others" involved in it. Id. cmt. n.4. Consequently, we conclude that he was not entitled to the "infrequently" used downward adjustment for being a minimal participant.[3] Id. cmt. n.4.

*3) Drug quantity*

Lunnin argues that the district court, in calculating his base offense level, erred in "accept[ing] the jury's [special] finding[s] that [his] conspiracy involved at least 50 kilograms of marijuana and 500 grams of methamphetamine." Aplt. Br. at 58. Lunnin argues that this "figure included methamphetamine for which [he] was not responsible" because "the prosecution in fact proved only that [he] was involved in 177.2 grams of methamphetamine" by loaning $5,000 to Shawn Smith for the purchase of drugs. Id.

The threshold problem for Lunnin is that he failed to assert this precise challenge below. To be sure, Lunnin objected to paragraph 37 of the presentence report (PSR), which stated, in pertinent part: "According to Shawn Smith, Kyle gave Smith money on four occasions totaling $22,500 and in turn made a profit of $10,000." ROA, Vol. II at 12. But Lunnin did not object to paragraph 61, which correctly noted that he "was found

---

[3] Lunnin did not argue below, and does not argue on appeal, that he was entitled to a reduction for being a minor participant.

guilty by a jury, [sic] of conspiring to distribute more than 500 grams of methamphetamine and 50 kilograms or more of marijuana," id. at 15, or to paragraph 70, which assigned him a base offense level of 32 based upon the jury's special findings of drug quantity, id. at 16.

In addition, Lunnin asked the district court, both in his sentencing memorandum and at the sentencing hearing, to depart downward to a total offense level of 32. By doing so, Lunnin effectively conceded that, in light of the jury's special findings regarding the drug quantities, the district court could not sentence him below the ten-year statutory minimum sentence that corresponded with those findings.

For these reasons, we conclude that Lunnin waived any challenge to the district court's drug-quantity findings. And, even assuming, for purposes of argument, that Lunnin has not waived his challenge to the district court's drug-quantity findings, we conclude that the jury's findings were adequately supported by the evidence presented at trial. To be sure, Shawn Smith did not testify at trial and thus the jury did not hear the evidence indicating that Lunnin invested $22,500 rather than $5,000 in the conspiracy. But the jury not only heard about Lunnin's $5,000 investment, but also about him having collected drug money from Hinderliter on one occasion and having assisted Smith and others in counting a large sum of drug money at Hinderliter's house. Based upon these activities and the quantity of drugs likely associated with them, it was reasonable for the jury to find that Lunnin was responsible for more than 500 grams of methamphetamine and more than 50 grams of marijuana.

*G. Substantive reasonableness of the sentence*

In his seventh and final issue on appeal, Lunnin argues that the fourteen-year sentence imposed by the district court is substantively unreasonable. "Substantive reasonableness . . . involves whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)." United States v. Sayad, 589 F.3d 1110, 1116 (10th Cir. 2009) (internal quotation marks and brackets omitted). We "review[] a sentence for substantive reasonableness under the abuse-of-discretion standard." Id. Under this standard, a sentence will be deemed substantively unreasonable "only if it is arbitrary, capricious, whimsical, or manifestly unreasonable." Id. (internal quotation marks omitted). If the sentence imposed "is within a properly calculated Guideline[s] range, it is entitled to a rebuttable presumption of reasonableness." United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008).

In this case, the district court calculated Lunnin's total offense level to be 37 and his criminal history category to be I. ROA, Vol. III at 634. The district court noted that this resulted in an advisory Guidelines sentencing range of 210 to 262 months on the conspiracy conviction and 210 to 240 months on the tampering conviction. Id. The district court further noted that the conspiracy conviction carried "a mandatory minimum of 10 years and up to life in prison," and the tampering conviction carried "a maximum of 20 years by statute." Id. Ultimately, however, the district court "sentence[d] him to a term of 144 months on [both counts], plus a consecutive 24 months, pursuant to 18 U.S.C. [§] 3147, for a controlling prison sentence of 168 months." Id. at 639. In doing so, the

district court granted Lunnin a two-level downward departure that effectively resulted in a total offense level of 35, a corresponding Guidelines range of 168 to 210 months, and a sentence at the very bottom of that Guidelines range.  Id. at 637.

Lunnin now argues that his sentence is substantively unreasonable because it "dwarfs those of his more culpable co-Defendants" who "were embroiled in the drug business."  Aplt. Br. at 61.  In particular, he argues that "[t]he contrast of 14 years with nothing for Hinderliter and the scores of other individuals implicated by the evidence epitomizes an unwarranted sentence disparity."  Id. at 62.

In our view, these arguments are insufficient to overcome the presumption of reasonableness that we must afford to the sentence imposed by the district court. Although Lunnin played a lesser role in the conspiracy than many of the other coconspirators, the fact of the matter is that most of those codefendants pleaded guilty and cooperated with the government in the prosecution of Lunnin.  Further, the district court expressly agreed with the prosecution at the time of sentencing that any sentencing disparity between Lunnin and his coconspirators was the result of his decision to go to trial rather than plead guilty, as well as his decision to threaten Hinderliter while on release pending trial.  ROA, Vol. III at 630, 633.  As for Hinderliter in particular, it is true that he was not prosecuted for his role in the offense.  But the evidence presented at trial established that he provided substantial assistance to the government in investigating and prosecuting the conspiracy.

Lunnin also argues that his sentence violates "§ 3553's parsimony provision,

which requires that a sentence be sufficient, but not greater than necessary to accomplish the goals of sentencing." Aplt. Br. at 62 (internal quotation marks omitted). In support, he argues that "[t]he failure to achieve this aim again becomes clear when [his] sentence is compared to the co-Defendants." Id. at 62-63. He also notes that he "was given 14 years for crimes of a non-violent nature." Id. at 63.

For the reasons outlined above, and because the sentence imposed was at the very bottom of the advisory Guidelines range, we conclude that Lunnin's arguments lack merit and that he has failed to overcome the presumption of reasonableness that must be afforded to the sentence.

### III

Lunnin's convictions and sentence are AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Chief Judge

29