**[J-84-2020] [MO:Dougherty, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.J.M., A MINOR | : | No. 23 MAP 2020 |
| | : | |
| | : | Appeal from the Order of the |
| APPEAL OF: J.J.M., A MINOR | : | Superior Court at No. 1245 MDA |
| | : | 2018 dated September 10, 2019 |
| | : | affirming the Order of the Luzerne |
| | : | County Court of Common Pleas, |
| | : | Juvenile Division, at No. CP-40-JV- |
| | : | 0000119-2018 dated May 14, 2018. |
| | : | |
| | : | ARGUED:  October 20, 2020 |

**<u>CONCURRING OPINION</u>**

**JUSTICE TODD**                                    **DECIDED:  December 21, 2021**

This case requires us to determine whether 18 Pa.C.S. § 2706(a)(3), which allows for a conviction for terroristic threats based on recklessness, is unconstitutionally overbroad under the First Amendment.  The majority answers this question in the negative, holding that speech made with a reckless disregard of its threatening nature, as opposed to speech made with a specific intent to terrorize, can support a conviction under Section 2706(a)(3) without running afoul of the First Amendment.  Nevertheless, applying this standard to the facts of this case, the majority holds that Appellant's statements were not made with a reckless disregard of their threatening nature, and, therefore, "did not cross the constitutional threshold from protected speech to an unprotected true threat." Majority Opinion at 1-2.  Thus, on this basis, the majority vacates Appellant's adjudication of delinquency.  For the reasons that follow, I respectfully disagree with the majority's conclusion regarding the constitutionality of Section 2706(a)(3), as, in my view, to the extent Section 2706(a)(3) permits a conviction for speech in the absence of proof of the

speaker's specific intent to inflict harm, it is unconstitutionally overbroad. On this distinct ground, I conclude that Appellant's adjudication of delinquency must be vacated. Thus, I join Parts I, II, and III of the majority opinion and its mandate to vacate Appellant's adjudication of delinquency, but I do not join Part IV.

My disagreement with the majority stems from our differing interpretations of the same relevant precedent; thus, I must begin there. The right to freedom of speech, as guaranteed by the United States Constitution, is not absolute, and the Constitution "tolerates content-based speech restrictions in certain limited areas when that speech is 'of such slight social value as a step to truth that any benefit that may be derived from [it] is clearly outweighed by the social interest in order and morality.'" *Commonwealth v. Knox*, 190 A.3d 1146, 1154 (Pa. 2018) (citation omitted). Examples of the types of speech that may be subject to such restrictions include fighting words, *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942); incitement to imminent lawlessness, *Brandenburg v. Ohio*, 395 U.S. 444 (1969) (*per curiam*); obscenity, *Miller v. California*, 413 U.S. 15 (1973); defamation, *New York Times v. Sullivan*, 376 U.S. 254 (1964); and child pornography, fraud, and other speech "integral to criminal conduct," *United States v. Alvarez*, 567 U.S. 709 (2012).

Additionally, speech in which the speaker means to communicate a serious expression of intent to commit an act of unlawful violence against a particular individual or group of individuals − "true threats" − may be restricted, and may subject the speaker to criminal sanction. True threats fall outside the protective umbrella of the First Amendment due to the need to protect individuals "from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992).

As the majority observes, the true threat category of speech, which is at issue in the case *sub judice*, was first examined by the United States Supreme Court in *Watts v. United States*, 394 U.S. 705 (1969) (*per curiam*). During the Vietnam war, while the military draft was in effect, Watts was attending a discussion group in Washington, D.C. At one point during the discussion, someone suggested that young people should become more educated before expressing their views, to which Watts responded:

> They always holler at us to get an education. And now I have already received my draft classification as 1-A and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J.

*Id.* at 706 (internal quotation marks and citation omitted).

Based on his statement, Watts was convicted of threating the President in violation of 18 U.S.C. § 871(a); however, the high Court overturned Watts' conviction on appeal. Despite finding the federal statute facially valid in light of the overwhelming interest in physically protecting the President and allowing him to perform his duties without the threat of violence, the high Court held that Watts' conviction could be upheld only if his words conveyed an actual threat, as opposed to political hyperbole. After considering the full context of Watts' statement, including the fact that it was made during a political debate, was conditioned on an event that Watts vowed would never occur (his induction into the military), and was greeted by laughter from the audience, the Court concluded that the statement was merely an expression of political dissent, rather than a true threat.

After *Watts*, several courts, this Court included, focused on contextual circumstances in evaluating whether a speaker's words constituted a true threat, applying an objective listener standard. For example, in *J.S. ex rel. H.S. v. Bethlehem Area School District*, 807 A.2d 847, 854 (Pa. 2002), *abrogated by Commonwealth v. Knox*, 190 A.3d 1146 (Pa. 2018), J.S., an eighth-grade student, created a website from his home

computer titled "Teacher Sux." The website contained derogatory, profane, offensive, and threatening comments about his algebra teacher. One page of the website listed reasons why J.S. believed the teacher should face termination, and another page depicted her face as Adolf Hitler. Another page of the website was titled "Why Should She Die?" and included a request for donations of $20 "to help pay for the hitman." 807 A.2d at 851. The website contained numerous expletives and derogatory content regarding the teacher, including an illustration showing her in a decapitated state, with blood dripping from her neck. The teacher learned of the website and believed the threats to be serious, and thus contacted the local police and the FBI. Law enforcement declined to file charges, but the school district expelled J.S. J.S. appealed the expulsion to the court of common pleas, alleging that it violated his First Amendment right to free speech because, *inter alia*, his speech did not constitute a true threat. The trial court affirmed, as did the Commonwealth Court.

This Court reversed on appeal. Relying upon various federal decisions consistent with *Watts*, we explained that, in determining whether speech falls within the definition of a true threat − "that is, if the communication is a serious expression of intent to inflict harm" − courts must "consider the statements, the context in which they were made, the reaction of listeners and others as well as the nature of the comments." *Id.* at 858. We noted that, in *J.S.*, the statements and website were not communicated directly to the teacher, and, indeed, included a notice that school faculty should not view the website. We also noted that there was no evidence that J.S. had made similar statements to the teacher on prior occasions, or that the teacher, while distraught after viewing the website, "had any reason to believe that J.S. had the propensity to engage in violence, more than any other student of his age." *Id.* at 859. Accordingly, we held that, in light of the totality of the circumstances, J.S.'s speech did not constitute a true threat, but instead was merely

"a sophomoric, crude, highly offensive and perhaps misguided attempt at humor or parody," which "did not reflect a serious expression of intent to inflict harm." *Id.*

In 2003, the United States Supreme Court revisited the concept of a true threat in *Virginia v. Black*, 538 U.S. 343 (2003) (plurality), when it examined a Virginia statute which made it unlawful to burn a cross in public or on another's property with the intent to intimidate any person or group. The statute contained a provision making the burning of a cross *prima facie* evidence of an intent to intimidate a person or group of persons. In a consolidated appeal, the Virginia Supreme Court ruled the statute unconstitutional because it discriminated on the basis of content, in that it "selectively chooses only cross burning because of its distinctive message." *Black v. Commonwealth*, 553 S.E.2d 738, 744 (Va. 2001). The court further held that the *prima facie* evidence provision rendered the statute overbroad because the "enhanced probability of prosecution under the statute chills the expression of protected speech." *Id.* at 746. Upon review of the statute, a majority of the United States Supreme Court determined that, while the statute did not violate the First Amendment insofar as it criminalized cross burning done with an intent to intimidate, the statutory presumption that the burning of a cross was *prima facie* evidence of an intent to intimidate a person or group of persons was, in fact, unconstitutional under the First Amendment.

Justice O'Connor, in a lead opinion joined by Chief Justice Rehnquist, Justice Stevens (who authored a separate concurring opinion), and Justice Breyer, explained:

> "True threats" encompass those statements *where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. See Watts v. United States*, [394 U.S. at 708] ("political hy[p]erpole" is not a true threat); *R.A.V. v. City of St. Paul*, [505 U.S. 377, 388 (1992)]. The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats "protect[s] individuals from the fear of violence" and "from the disruption that fear

engenders," in addition to protecting people "from the possibility that the threatened violence will occur." *Ibid.* Intimidation in the constitutionally proscribable sense of the word is a type of true threat, *where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.*

538 U.S. at 359-60 (emphasis added). Thus, *Black* made clear that, in determining whether particular speech constitutes a true threat, consideration must be given not only to the contextual circumstances, *but also to the speaker's intent.*

Addressing the Virginia Supreme Court's conclusion that, pursuant to the high Court's decision in *R.A.V.*, the Virginia statute was unconstitutional because it discriminated on the basis of content and viewpoint, Justice O'Connor explained:

> In *R.A.V.*, we held that a local ordinance that banned certain symbolic conduct, including cross burning, when done with the knowledge that such conduct would "'arouse anger, alarm or resentment in others on the basis of race, color, creed, religion or gender'" was unconstitutional. We held that the ordinance did not pass constitutional muster because it discriminated on the basis of content by targeting only those individuals who "provoke violence" on a basis specified in the law. The ordinance did not cover "[t]hose who wish to use 'fighting words' in connection with other ideas−to express hostility, for example, on the basis of political affiliation, union membership, or homosexuality." This content-based discrimination was unconstitutional because it allowed the city "to impose special prohibitions on those speakers who express views on disfavored subjects."

538 U.S. at 361 (citations omitted).

Justice O'Connor emphasized that the Court "did not hold in *R.A.V.* that the First Amendment prohibits *all* forms of content-based discrimination within a proscribable area of speech." *Id.* (emphasis original). Rather, the Court held that some types of content-based discrimination do not violate the First Amendment:

> "When the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable, no significant danger of idea or viewpoint discrimination exists. Such a reason, having been adjudged

neutral enough to support exclusion of the entire class of speech from First Amendment protection, is also neutral enough to form the basis of distinction within the class."

*Id.* at 361-62 (quoting *R.A.V.*, 538 U.S. at 388).

Justice O'Connor then observed that, unlike the statute at issue in *R.A.V.*, the Virginia statute:

> does not single out for opprobrium only that speech directed toward "one of the specified disfavored topics." It does not matter whether an individual burns a cross with intent to intimidate because of the victim's race, gender, or religion, or because of the victim's "political affiliation, union membership, or homosexuality." Moreover, as a factual matter it is not true that cross burners direct their intimidating conduct solely to racial or religious minorities.
>
> The First Amendment permits Virginia to outlaw cross burnings done with the intent to intimidate because burning a cross is a particularly virulent form of intimidation. Instead of prohibiting all intimidating messages, Virginia may choose to regulate this subset of intimidating messages in light of cross burning's long and pernicious history as a signal of impending violence. . . . A ban on cross burning carried out with the intent to intimidate is fully consistent with our holding in *R.A.V.* and is proscribable under the First Amendment.

*Id.* at 362-63 (internal citations omitted).

Turning to the separate issue of whether the statutory presumption that the burning of a cross was *prima facie* evidence of an intent to intimidate rendered the Virginia statute unconstitutionally overbroad, Justice O'Connor found that it did, explaining:

> As construed by the jury instruction, the prima facie provision strips away the very reason why a State may ban cross burning with the intent to intimidate. The prima facie evidence provision permits a jury to convict in every cross-burning case in which defendants exercise their constitutional right not to put on a defense. And even where a defendant . . . presents a defense, the prima facie evidence provision makes it more likely that the jury will find an intent to intimidate regardless of the particular facts of the case. The provision permits the Commonwealth to arrest, prosecute, and convict a person based solely on the fact of cross burning itself.

It is apparent that the provision as so interpreted "'would create an unacceptable risk of the suppression of ideas.'" The act of burning a cross may mean that a person is engaging in constitutionally proscribable intimidation. But that same act may mean only that the person is engaged in core political speech. The prima facie evidence provision in this statute blurs the line between these two meanings of a burning cross. As interpreted by the jury instruction, the provision chills constitutionally protected political speech because of the possibility that the Commonwealth will prosecute − and potentially convict − somebody engaging only in lawful political speech at the core of what the First Amendment is designed to protect.

*Id.* at 365 (internal citations omitted).

Thus, the plurality concluded that "the prima facie evidence provision, as interpreted through the jury instruction . . . is unconstitutional on its face." *Id.* at 367. Nevertheless, recognizing that "the Supreme Court of Virginia has not authoritatively interpreted the meaning of the prima facie evidence provision," the plurality refused "to speculate on whether *any* interpretation of the prima facie evidence provision would satisfy the First Amendment," and acknowledged "the theoretical possibility that the court, on remand, could interpret the provision" in a manner that would avoid the constitutional deficiencies. *Id.* (emphasis original).

Justice Souter, joined by Justices Kennedy and Ginsburg, agreed with the plurality that the *prima facie* evidence provision rendered the Virginia statute facially unconstitutional because it effectively eliminated the intent requirement. *Id.* at 385 (Souter, J., concurring in the judgment in part and dissenting in part) (noting that "the symbolic act of burning a cross . . . is consistent with both intent to intimidate and intent to make an ideological statement free of any aim to threaten"). However, he disagreed with the plurality's suggestion that the Virginia Supreme Court could, on remand, interpret the *prima facie* evidence provision in a different manner so as to save the statute as a whole from facial unconstitutionality. *Id.* at 387.

Justice Scalia, joined in part by Justice Thomas, agreed that, under the high Court's decision in *R.A.V.*, Virginia's prohibition on "cross burning carried out with the intent to intimidate" does not violate the First Amendment. *Id.* at 368 (Scalia, J., concurring in part, concurring in the judgment in part, and dissenting in part). He disagreed, however, with the plurality's decision to invalidate the Virginia statute's *prima facie* provision on its face, and would have allowed case-by-case challenges to convictions where the State was not required to prove intent. *Id.* at 372-73.

Finally, Justice Thomas dissented, suggesting that, because the Virginia statute applied only to conduct, not expression, it did not implicate any First Amendment concerns. *Id.* at 394-95 (Thomas, J., dissenting). Alternatively, Justice Thomas concluded that, even applying First Amendment principles, "the fact that the statute permits a jury to draw an inference of intent to intimidate from the cross burning itself presents no constitutional problems." *Id.* at 395.

More than a decade after *Black*, in *Elonis v. United States*, 135 S. Ct. 2001 (2015), the high Court reiterated that a speaker's mental state is an essential consideration in determining whether a statement constitutes a true threat. Elonis had posted rap lyrics and other material on the Facebook social media platform. The lyrics contained violent language and imagery pertaining to his wife, coworkers, and others, although the material was interspersed with disclaimers indicating the lyrics were fictitious, and bore no intentional resemblance to real people. Ultimately, Elonis was convicted of four counts of transmitting threats to injure in violation of 18 U.S.C. § 875(c). On appeal, he argued that the district court erred in denying his request that the jury be instructed that the government was required to prove that he intended to communicate a true threat.

The Supreme Court recognized that the federal statute under which Elonis was convicted was "meant to proscribe a broad class of threats . . . but did not identify what

mental state, if any, a defendant must have to be convicted." *Elonis*, 135 S. Ct. at 2008. The high Court concluded that Elonis's conviction, which was "premised solely on how his posts would be understood by a reasonable person," could not stand, because such a standard is "inconsistent with 'the conventional requirement for criminal conduct − *awareness* of some wrongdoing.'" *Id.* at 2011 (citation omitted and emphasis original). The Court further explained that "[h]aving liability turn on whether a 'reasonable person' regards the communication as a threat − regardless of what the defendant thinks − 'reduces culpability on the all-important element of the crime to negligence,' and we 'have long been reluctant to infer that a negligence standard was intended in criminal statutes.'" *Id.* (citations omitted). However, as the parties neither briefed nor argued the issue of whether a finding of recklessness would be sufficient to sustain a conviction under Section 875(c), the Court did not resolve that particular question.

As noted by the majority, in the wake of *Black*, federal courts have disagreed as to whether *Black's* definition of a true threat requires that the speaker merely intend to communicate a statement, or whether the speaker must intend that the statement be interpreted by the recipient as a serious expression of an intent to commit an act of unlawful violence. *See* Majority Opinion at 15. Indeed, in *Knox, supra*, we recognized the absence of a consensus on this issue. In that case, Knox had created a rap music video which threatened certain city police officers by name. After a third party posted the video on the internet, Knox was charged and convicted of terroristic threats under Section 2706(a)(1). On appeal, before considering whether the video constituted a true threat, we acknowledged:

> Some [courts] have continued to use an objective, reasonable-person standard. These courts interpret *Black*'s intent requirement as applying to the act of transmitting the communication. *See United States v. Clemens*, 738 F.3d 1, 11 (1st Cir. 2013) (citing cases). In their view, an objective standard remains appropriate for judging whether the speech,

taken in its full context, embodies a serious expression of an intent to commit unlawful violence. They reason from the premise that the First Amendment traditionally lifts its protections based on the injury inflicted rather than the speaker's guilty mind. *See, e.g.*, *United States v. Jeffries*, 692 F.3d 473, 480 (6th Cir. 2012), *abrogation on other grounds recognized by United States v. Houston*, 683 Fed.Appx. 434, 438 (6th Cir. 2017); *United States v. White*, 670 F.3d 498, 508-09 (4th Cir. 2012), *abrogated on other grounds by United States v. White*, 810 F.3d 212, 220 (4th Cir. 2016).

Other courts have read *Black* as implying that the First Amendment only allows the government to penalize threatening speech uttered with the highest level of scienter, namely, a specific intent to intimidate or terrorize. *See United States v. Cassel*, 408 F.3d 622, 632-33 (9th Cir. 2005); *but cf. Fogel v. Collins*, 531 F.3d 824, 831 (9th Cir. 2008) (observing that the Ninth Circuit has not consistently followed a subjective-intent standard). Still others have charted something of a middle course, suggesting that "an entirely objective definition [of a true threat] is no longer tenable" after *Black*, while reserving judgment on whether the standard should be subjective only, or a subjective-objective combination pursuant to which a statement "must objectively *be* a threat and subjectively be *intended* as such." *United States v. Parr*, 545 F.3d 491, 500 (7th Cir. 2008) (emphasis in original).

190 A.3d at 1156.

Ultimately, this Court recognized in *Knox* that, following the high Court's decision in *Black*, "an objective, reasonable-listener standard such as that used in *J.S.* is no longer viable for purposes of a criminal prosecution pursuant to a general anti-threat enactment." *Id.* at 1156-57. We further held that, under *Black*, "the First Amendment necessitates an inquiry into the speaker's mental state," noting that the Justices in *Black* who found the Virginia statute's presumption as constitutionally problematic appeared to focus on "values and concerns associated with the First Amendment: the social undesirability of suppressing ideas, punishing points of view, or criminalizing statements of solidarity or ideology." *Knox*, 190 A.3d at 1157. We reasoned that "[c]onstruing the [*Black*] Court's discussion of the speaker's intent as pertaining solely to the act of transmitting the speech

appears difficult to harmonize with" the principle that "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons *with the intent of placing the victim in fear* of bodily harm or death." *Id.* (quoting *Black*, 538 U.S. at 360) (emphasis original).

Accepting that the high Court in *Black* left open the question of "whether a statute which criminalizes threatening statements spoken with a lower scienter threshold, such as knowledge or reckless disregard of their threatening nature, can survive First Amendment scrutiny," *id.* at 1157 n.10, we concluded that *Black* established two specific principles: "First, the Constitution allows states to criminalize threatening speech which is specifically intended to terrorize or intimidate. Second, in evaluating whether the speaker acted with an intent to terrorize or intimidate, evidentiary weight should be given to contextual circumstances such as those referenced in *Watts*." *Id.* at 1158. As noted above, those contextual factors include whether the threat was conditional, whether it was communicated directly to the victim, whether the victim had reason to believe the speaker had a propensity to engage in violence, and how the listeners reacted to the speech. *See also J.S.*

Applying that standard to Knox's video, we noted that Knox's threats were primarily unconditional; that the officer who initially viewed the video immediately notified police personnel, which suggested he did not view the video as satire or social commentary; and that the officers identified in the video were concerned for their safety and took precautions to avoid becoming victims of violence. We opined that the fact that the video was not communicated directly to the police, but had been uploaded to the internet by a third party, did not negate an intent by Knox that it would be viewed by the officers. Ultimately, we found that Knox's video demonstrated a subjective intent on his part to

terrorize or intimidate the police officers, and that, as a result, it constituted a true threat. Thus, we upheld Knox's conviction.

Justice Wecht authored a thoughtful concurring and dissenting opinion in *Knox*, which was joined by Justice Donohue, in which he agreed with the majority that *Black* rendered the previously-applied objective reasonable-listener standard for determining whether speech was a true threat no longer viable. *Knox*, 190 A.3d at 1161 (Wecht, J., concurring and dissenting). Justice Wecht additionally agreed with the *Knox* majority's conclusion that an "assessment of the speaker's subjective intent" is necessary in determining whether speech constitutes a true threat, and he joined the majority in affirming Knox's convictions. *Id.* However, Justice Wecht disagreed with the majority's decision not "to consider the more important question of whether the First Amendment *requires* proof of specific intent, or whether the [First] Amendment would tolerate punishment of speech based upon proof of only a lesser *mens rea* such as recklessness or knowledge." *Id.* at 1162 (emphasis original).[1] After examining the positions adopted by the various courts of appeals, Justice Wecht endorsed the view adopted by the Ninth Circuit in *Cassel*, suggesting:

> [T]he Ninth Circuit correctly determined that the reasoning underlying the Supreme Court's *Black* decision necessitates the conclusion that the First Amendment requires such a subjective examination, and that proof of the speaker's intent to intimidate the recipient of the communication is a required inquiry in order to balance the need to protect victims of threats with the First Amendment rights of the speaker.

*Id.* at 1164.

---

[1] As the majority concluded that the evidence was sufficient to support a finding that Knox acted with subjective intent to terrorize and intimidate, and, therefore, that his conviction was constitutionally supportable on that basis, the majority found it unnecessary to consider whether a conviction based on a lower *mens rea* would violate the First Amendment.

Nevertheless, Justice Wecht agreed with the majority that consideration of the speaker's mindset is only half of the analysis, and he advocated for the following two-prong approach for determining whether speech constitutes a true threat:

> First, I would require reviewing courts to conduct an objective analysis to determine whether reasonable recipients would consider the statement to be "a serious expression of intent to inflict harm," and not merely jest, hyperbole, or a steam valve. *J.S.*, 807 A.2d at 858. For this purpose, I believe that the factors that we delineated in *J.S.* . . . are relevant and useful. Those factors include: "the statements, the context in which they were made, the reaction of the listeners and others as well as the nature of the comments." *Id.* No one factor should be considered conclusive, and each should be considered and analyzed, alone and against the others, under the totality of the circumstances. Second, if the first prong is satisfied, I would require courts to conduct *a subjective analysis to ascertain whether the speaker specifically intended to intimidate the victim or victims, or intended his expression to be received as a threat to the victim or victims.* Failure of the government to satisfy either prong would mean that, under the First Amendment, the statement cannot be penalized or proscribed.

*Id.* at 1165 (emphasis added).

In the instant case, the Commonwealth and its *amici* suggest that it remains an open question whether speech made with reckless disregard of the effect on a recipient may be deemed a true threat not subject to First Amendment protection, and they would answer this question in the affirmative. In support of their position, they rely on Justice Alito's concurring and dissenting opinion in *Elonis*, in which he opined that recklessness is, in fact, the appropriate *mens rea* for determining whether speech constitutes a true threat, as well as Justice Thomas's dissent in *Elonis*, wherein he stated that lower courts "can safely infer that a majority of this court would not adopt an intent-to-threaten requirement, as the opinion carefully leaves open the possibility that recklessness may be enough." *Elonis*, 135 S. Ct. at 2018 (Thomas, J., dissenting).

The positions of Justices Alito and Thomas, however, were the *minority* positions in *Elonis*, and, obviously, are not controlling. Moreover, a subsequent expression by one member of the high Court suggests that, despite Justice Thomas's prediction, a holding by the high Court that permits a finding of a true threat based only upon a finding of the speaker's recklessness is not a foregone conclusion. *See Perez v. Florida*, 137 S. Ct. 853 (2017) (Sotomayor, J., concurring in the denial of *certiorari*). In *Perez*, the defendant was charged under a Florida statute making it a felony "to threaten to throw, project, place, or discharge any destructive device with intent to do bodily harm to any person or with intent to do damage to any property of any person." *Id.* at 853 (quoting Fla. Stat. § 790.162 (2007)). The charges arose after Perez, while inebriated, went to a liquor store to obtain ingredients for what he referred to as a "Molly cocktail." *Id.* One of the employees thought Perez was referring to an incendiary Molotov cocktail, and asked Perez if it would burn anything up. Perez responded that he did not have that type of cocktail, and his group of friends laughed at the joke. Perez, however, continued to joke about having a Molotov cocktail, and then stated he was going to blow up the store and the world, at which point store employees notified the police.

At trial, the court instructed the jury that it could find Perez guilty if the State proved that (1) there was a threat, namely, "a communicated intent to inflict harm or loss on another when viewed and/or heard by an ordinary reasonable person;" and (2) that Perez intended to make the threat, intent being defined as "the stated intent to do bodily harm to any person or damage to the property of any person." *Id.* at 854. Following his conviction, Perez petitioned for *certiorari*, challenging the trial court's instruction on the basis that it did not require proof of his *mens rea.* The high Court denied review.

In an opinion concurring in the denial of *certiorari*, Justice Sotomayor suggested that the jury instructions and Perez's conviction raised serious First Amendment concerns

worthy of review. Specifically, she explained that "statutes criminalizing threatening speech . . . 'must be interpreted with the commands of the First Amendment clearly in mind' in order to distinguish true threats from constitutionally protected speech. . . . Under our cases, this distinction turns in part on the speaker's intent." *Id.* at 854.

She reiterated that the high Court has defined a true threat as one "where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Id.* (quoting *Black*, 538 U.S. at 359). Justice Sotomayor further opined:

> Together, *Watts* and *Black* make clear that to sustain a threat conviction without encroaching upon the First Amendment, States must prove more than the mere utterance of threatening words—*some* level of intent is required. And these two cases strongly suggest that it is not enough that a reasonable person might have understood the words as a threat—a jury must find that the speaker actually intended to convey a threat.
>
> The jury instruction in this case relieved the State of its burden of proving anything other than Perez's "stated" or "communicated" intent. This replicates the view we doubted in *Watts*, which permitted a criminal conviction based upon threating words and only "'an *apparent* determination to carry them into execution.'" . . . And like the prima facie provision in *Black*, the trial court's jury instruction "ignore[d] all of the contextual factors that are necessary to decide whether a particular [expression] is intended to intimidate.

*Id.* at 855 (citations omitted and emphasis original). However, because the lower courts had not reached the merits of the First Amendment issue, Justice Sotomayor "reluctantly" concurred in the denial of *certiorari*. *Id.* at 854.

Given Justice Sotomayor's reasoning, it is evident that, at present, the high Court is not of one mind as to whether a recklessness standard, rather than whether the speaker intended to intimidate the listener, is the appropriate test for determining whether there has been a true threat. Accordingly, I agree with the majority that we lack definitive

guidance from the high Court, and, as a result, that we must "chart our own course." Majority Opinion at 27. For the reasons that follow, however, I would follow a different path than the majority.

As noted above, the high Court in *Black* explained that:

> "true threats" encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. *See Watts v. United States*, supra, at 708 . . . ("political hy[p]erpole" is not a true threat); *R.A.V. v. City of St. Paul*, 505 U.S.[ ] at 388 . . . . The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats "protect[s] individuals from the fear of violence" and "from the disruption that fear engenders," in addition to protecting people "from the possibility that the threatened violence will occur." *Ibid.* Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.

538 U.S. at 359-60. Though *Black* produced five separate opinions, when read together, in my view, a majority of the *Black* Court agreed that true threats are constitutionally proscribable if the government can prove that the speaker intended to intimidate the victim. *See Black*, 538 U.S. at 359-60, 365 (O'Connor, J., plurality, joined by Rehnquist, C.J., Stevens, Breyer, JJ. ); *id.* at 372 (Scalia, J., concurring in part, concurring in the judgment in part, and dissenting in part) (agreeing that Virginia statute was "constitutionally problematic" insofar as it allowed for convictions in the absence of proof of a defendant's intent to intimidate); *id.* at 385 (Souter, J. concurring in the judgment in part and dissenting in part, joined by Kennedy and Ginsburg, JJ.) (observing that the effect of the *prima facie* evidence provision is "to skew jury deliberations toward conviction in cases where the evidence of intent to intimidate is relatively weak and arguably consistent with a solely ideological reason for burning").

While some courts have interpreted *Black's* intent requirement as applying only to the act of transmitting the communication, in my view, these interpretations fail to give due consideration to the entire definition of true threat set forth above − namely, that *the speaker means to communicate a serious expression of an intent to commit violence*. Several courts have reached this same conclusion. For example, in *Cassel*, *supra*, the Ninth Circuit Court of Appeals opined that a "natural reading" of *Black's* definition of a true threat requires not only that the communication be intentional, but also that the speaker intend for his language to *threaten* the victim. 408 F.3d at 631 (emphasis original). The court reasoned:

> The [*Black*] Court's insistence on intent to threaten as the *sine qua non* of a constitutionally punishable threat is especially clear from its ultimate holding that the Virginia statute was unconstitutional precisely because the element of intent was effectively eliminated by the statute's provision rendering any burning of a cross on the property of another "prima facie evidence of an intent to intimidate."

*Id.* at 631.

Similarly, in *United States v. Heineman*, 767 F.3d 970 (10th Cir. 2014), the Tenth Circuit Court of Appeals stated: "[w]e read *Black* as establishing that a defendant can be constitutionally convicted of making a true threat only if the defendant *intended* the recipient of the threat to feel threatened." *Id.* at 978 (emphasis original). In *Heineman*, the defendant was convicted of transmitting in interstate commerce a threat to injure another, in violation of 18 U.S.C. § 875(c), after sending an email to a professor at the University of Utah, which caused the professor to fear for his own safety and that of his family. The statute did not contain a *mens rea* requirement. In concluding that the First Amendment requires that the government, in prosecuting a defendant based on a true threat, prove that the defendant intended the recipient to feel threatened, the *Heineman* court opined:

> When the [*Black*] Court says that the speaker must "mean[] to communicate a serious expression of an intent," it is requiring more than a purpose to communicate just the threatening words. *Id.* It is requiring that the speaker want the recipient to believe that the speaker intends to act violently. The point is made again later in the same paragraph when the Court applies the definition to intimidation threats: "Intimidation *in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.*"

767 F.3d at 978 (quoting *Black*, 538 U.S. at 359) (emphasis original).

The *Heineman* court further observed that the *Black* plurality's overbreadth analysis was based on the understanding that the speaker must intend to place the recipient in fear:

> According to the plurality, at least one First Amendment flaw in the prima facie provision was that a jury could infer an "intent to intimidate" from the act of cross-burning itself. [*Black*, 538 U.S. at 363]. The prima facie provision, wrote Justice O'Connor, "does not distinguish between a cross burning done with the purpose of creating anger or resentment and a cross burning done with the purpose of threatening or intimidating a victim." *Id.* at 366 [ ]. But how could that be a First Amendment problem if the First Amendment is indifferent to whether the speaker had an intent to threaten? The First Amendment overbreadth doctrine does not say simply that laws restricting speech should not prohibit too much speech. It says that laws restricting speech should not prohibit too much speech *that is protected by the First Amendment.*

767 F.3d at 978-79.[2]

---

[2] The *Heineman* Court acknowledged that Justice O'Connor's overbreadth analysis was not adopted by the majority of the Court, but noted that the plurality "obviously assumed that the discussion of the *R.A.V.* issue had already established that an intent to threaten was required;" that Justice Scalia did not challenge that assumption; and that Justice Souter's opinion "seems to have assumed that intent to instill fear is an element of a true threat required by the First Amendment." 767 F.3d at 979.

Like the courts in *Cassel* and *Heineman*, I conclude that both the language used by the *Black* Court in defining a true threat, as well as the plurality's determination that the Virginia statute was unconstitutional precisely because it eliminated the requirement of the intent to intimidate, dictates that, in order to criminalize a defendant's speech as a true threat, the government must prove that the defendant *intended* that the recipient feel threatened, not simply that the defendant communicate or utter words which might ultimately be construed by the listener as threatening.

I find further support for this interpretation in the *Black* Court's declaration that "[t]he speaker need not actually intend to carry out the threat," which appears immediately following the Court's statement that true threats "encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." 538 U.S. at 359-60. A caveat that the speaker need not actually intend to carry out the threat is understandable if there is a requirement that the defendant intend the victim to feel threatened. However, if a true threat may be established based only on the speaker's communication or utterance of certain words without regard to his subjective intent, such a qualification is wholly unnecessary. *See Heineman*, 767 F.3d at 980 ("The proposition that the speaker need not intend to carry out the threat is a helpful qualification if there is a requirement that the defendant intend the victim to feel threatened. But no such qualification is called for if the preceding sentence means that the only requisite *mens rea* is that the defendant 'knowingly says the words.'" (citation omitted)).

In addition, the Kansas Supreme Court recently considered a criminal threat statute that was, in relevant part, nearly identical to the one at issue in the case before us, and concluded, as a matter of first impression, that the statutory provision allowing for a conviction based on recklessness was unconstitutionally overbroad. In *State v.*

*Boettger*, 450 P.3d 805 (Kan. 2019), the defendant was convicted of making a "criminal threat," which the statute at issue defined as including a threat to "(1) [c]ommit violence communicated with intent to place another in fear . . . *or in reckless disregard of the risk of causing such fear.*" *Id.* at 807 (emphasis added). On appeal of his conviction, Boettger, argued, *inter alia*, that the portion of the statute allowing for a conviction based on a threat made with reckless disregard was unconstitutionally overbroad because it had the potential to punish someone for speech that does not constitute a true threat. The Kansas Supreme Court agreed.

In finding the portion of the statute which allowed for a conviction based on a threat made in reckless disregard for causing fear to be unconstitutionally overbroad, the *Boettger* Court, relying on the Ninth Circuit's reasoning in *Cassel* and the Tenth Circuit's reasoning in *Heineman*, stated:

> [A] majority of the *Black* Court determined an intent to intimidate was constitutionally, not just statutorily, required. "Intimidation *in the constitutionally proscribable sense of the word* is a type of true threat, where a speaker directs a threat to a person or group of persons *with the intent of placing the victim in fear of bodily harm or death.*"

450 P.3d at 815 (quoting *Black*, 538 U.S. at 360 (emphasis original)).

In addressing the Kansas intermediate court's reliance on Justice Alito's concurring and dissenting opinion in *Elonis* for its determination that "[r]ecklessness is sufficient *mens rea* to separate wrongful conduct from otherwise innocent conduct," the *Boettger* Court noted that it had "trouble squaring that conclusion with *Black* and *Elonis.*" 450 P.3d at 816. The court acknowledged that two jurisdictions, Connecticut and Georgia, agreed with Justice Alito's view,[3] and, further, that this Court in *Knox* suggested

---

[3] *See State v. Taupier*, 193 A.2d 1 (Conn. 2018) (holding recklessness standard constitutional in a true threat context), *cert. denied*, 139 S. Ct. 1188 (2019); *Major v. State*, 800 S.E.2d 348 (Ga. 2017) (upholding recklessness standard post-*Black*).

there is an open question as to whether the recklessness standard can be applied in the true threat context. However, the Kansas Supreme Court adopted the view it found "reflected in Justice Sotomayor's opinion in *Perez*," *id.* at 817, concluding:

> Under *Black*, the portion of [the statute] allowing for a conviction if a threat of violence is made in reckless disregard for causing fear causes the statute to be unconstitutionally overbroad because it can apply to statements made without the intent to cause fear of violence. The provision significantly targets protected activity. And its language provides no basis for distinguishing circumstances where the speech is constitutionally protected from those where the speech does not warrant protection under the First Amendment.

*Id.* at 818 (internal citation omitted).[4]

The majority "disagree[s] with those courts that have concluded *Black* is dispositive, or even particularly instructive," as to whether the First Amendment permits the criminalization of statements made in the absence of a specific intent to terrorize, opining that "those courts have simply read too much into *Black*." Majority Opinion at 26. Instead, the majority notes that its "own views align more closely with Justice Thomas's [dissenting opinion] on this point" that specific intent is not required. *Id.* at 26 n.13. However, as discussed *supra,* while there were five separate opinions in *Black*, in my view, a majority of the Justices in *Black* agreed that true threats are constitutionally proscribable only if the government can prove that the speaker intended to intimidate the victim. I would not disregard that consensus based on the opinions of a *dissenting* Justice in that case, or based on the decisions of the high Court in cases that did not involve true threats. *See, e.g.*, Majority Opinion at 28 (observing that the high Court has "recognized

---

[4] In response to Boettger's argument that the protester in *Watts* could have been convicted under the Kansas statute − an argument that Appellant makes regarding Section 2706(a)(3) − the court found the example a "persuasive illustration[] of ways in which the [Kansas statute] potentially criminalizes speech protected under the First Amendment." 450 P.3d at 818.

recklessness is a sufficient *mens rea* to render speech proscribable" in other First Amendment contexts, such as criminal and civil libel).

Thus, contrary to the majority, and for the reasons explained above, I conclude that, in order to criminalize a defendant's speech as a true threat without violating the First Amendment, the government must prove that the defendant *intended* that the recipient feel threatened, not merely that the defendant communicated or uttered words which might be construed as threatening by a listener. As Section 2706(a)(3) criminalizes speech which the speaker does not intend to convey as a threat, I would hold that it is unconstitutionally overbroad. On this basis, I would vacate Appellant's adjudication of delinquency under Section 2706(a)(3). Accordingly, while my underlying reasoning differs, I agree with the majority's determination to vacate Appellant's adjudication of delinquency, and, hence, concur in the result.

Justices Donohue and Wecht join this concurring opinion.